**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DIANA LYNNE L.,[1]                )
                                  )
             Plaintiff,           )
                                  )        **CIVIL ACTION**
v.                                )
                                  )        **No. 18-2709-JWL**
ANDREW M. SAUL,[2]                )
Commissioner of Social Security,  )
                                  )
             Defendant.           )
_____  )

**MEMORANDUM AND ORDER**

Plaintiff seeks review of a decision of the Commissioner of Social Security

denying Disability Insurance Benefits (DIB) pursuant to sections 216(i) and 223 of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act).  Finding no error

in the final decision of the Commissioner, the court ORDERS that judgment shall be

entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the

Commissioner's final decision.

**I.       Background**

---

[1] The court makes all its "Memorandum and Order[s]" available online.  Therefore, in the
interest of protecting the privacy interests of Social Security disability claimants, it has
determined to caption such opinions using only the initial of the Plaintiff's last name.
[2] On June 17, 2019, Andrew M. Saul was sworn in as Commissioner of Social Security.
In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Saul is
substituted for Acting Commissioner Nancy A. Berryhill as the defendant.  In accordance
with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

On December 11, 2013 Plaintiff applied for DIB alleging disability beginning July 7, 2011. (R. 309). After exhausting administrative remedies before the Social Security Administration (SSA), Plaintiff filed this case seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1). Plaintiff argues that the Commissioner's final decision (the Appeals Council decision) is erroneous because the Administrative Law Judge (ALJ) erroneously evaluated the opinion evidence and did not account for all of Plaintiff's mental limitations in the residual functional capacity (RFC) assessed. She also argues that the Appeals Council (AC) failed to apply the correct legal standard at step five of the sequential evaluation process because it failed to consult a vocational expert (VE) in determining that "an RFC for simple, routine, repetitive tasks would not significantly erode the occupational base." (Pl. Br. 28-30)[3] (citing R. 5).

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the Commissioner's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). "Substantial evidence"

---

[3] Plaintiff's counsel failed to paginate either of his briefs. Therefore, the court cites to the page numbers provided by the software it uses to read the ".pdf" docket files stored in its Case Management/Electronic Case Filing (CM/ECF) system.

refers to the weight of the evidence. It requires more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether

claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

## II.     The Final Decision

In accordance with sentence one and sentence two of 42 U.S.C. § 405(g) it is the final decision of the Commissioner which may be reviewed by a district court of the United States.  The AC made the final decision in this case, and it is that decision which is subject to this court's review.  (R. 4-6).  Nevertheless, the AC adopted certain portions

of the ALJ's decision (R. 4-5) and those portions constitute a part of the final decision in this case which is subject to judicial review by this court. Consequently, it is appropriate for Plaintiff to argue that the ALJ erred in those portions of his decision adopted by the AC. The court addresses the errors alleged in the order in which they are addressed in Plaintiff's Brief.

## III. Evidence the ALJ Allegedly Failed to Consider

Plaintiff first argues remand is necessary because the ALJ failed to consider and properly evaluate both the opinion evidence from Dr. Faber who treated Plaintiff and the opinion provided by one of the agency's employees. (Pl. Br. 22) (citing R. 388, 912). The Commissioner argues that the SSA employee's observation was neither uncontroverted nor significantly probative evidence which it was not error to disregard. (Comm'r Br. 19-20). He admits that the ALJ did not weigh Dr. Faber's opinion but argues that the ALJ could have discounted Dr. Faber's opinion with the same rationale he used to discount Dr. Cordova's opinion and the opinion was facially speculative and therefore not requiring discussion. Id. at 17-18. In her Reply Brief, Plaintiff argues that the Commissioner's argument that Dr. Faber's opinion was facially speculative is a post hoc rationale and that in any case "it was not 'speculative' that [Plaintiff] continued to have problems with the frontal lobe" because the "SPECT [(Single-Photon Emission Computed Tomography)] scan demonstrated a left frontal lobe hypoperfusion." (Reply 4) (citing R. 912). Plaintiff argues that the Commissioner is required to at least acknowledge the statement of his employee and because he did not, that is error requiring

remand.  Id. (citing Simpson v. Astrue, Civ. A. No. 11-2648-JWL, 2012 WL 5199744 (D. Kan. Oct. 22, 2012)).

As Plaintiff suggests, the Commissioner is required to evaluate and explain the weight accorded to each medical opinion in the record.  20 C.F.R. § 404.1527; Soc. Sec. Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2019). Moreover, an ALJ is required to consider each third-party opinion in the record, but he is not required to make specific written findings regarding third-party lay opinions if the written decision reflects that the ALJ considered it.  Blea v. Barnhart, 466 F.3d 903, 914-15 (10th Cir. 2006); Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996).  Nevertheless, the court finds that the "opinions" at issue here are not really opinions within the meaning of the Act and regulations, are not probative to the Commissioner's consideration of disability in this case, and it was not error to fail to discuss them.

Dr. Faber's "opinion" appears in a "To Whom It May Concern" letter dated April 11, 2014 from Dr. Faber at the Amen Clinic in Atlanta, Georgia.  (R. 912).  Plaintiff argues that Dr. Faber opined that Plaintiff "would have continued problems with her left frontal lobe, and it would be very difficult for her to complete routine tasks at her job." (Pl. Br. 22).  Dr. Faber's letter states that almost a year earlier Plaintiff "came to a clinic for a psychiatric evaluation including SPECT Scans on May 21, 2013."  (R. 912).  The record does not contain the treatment notes from Plaintiff's 2013 visit, the reports of the SPECT Scans, or any treatment notes from the Amen Clinic.  Dr. Faber stated:

> At the time I saw [Plaintiff] in our office last year, she was struggling with her ability to function and follow through with job related tasks.  Should she continue to have problems with her left frontal lobe, which I speculate

are continuing to occur, it would be very difficult for [her] to complete
routine tasks at her job.

Id.  This "opinion" reveals two speculative conditions.  First, Dr. Faber speculated a year

after seeing Plaintiff and with no intervening treatment that Plaintiff was continuing to

have (undefined) "problems" with her left frontal lobe.  Second, he speculated that if the

first speculation was in fact true, it would be "difficult" for Plaintiff to complete routine

tasks.  There is simply no rational, concrete way to evaluate this "opinion."  As the

Commissioner suggests, merely speculating on possible difficulties without opining on

functional limitations does not require consideration of the "opinion."  Paulsen v. Colvin,

665 F. App'x 660, 666 (10th Cir. 2016).

To a similar effect is the court's consideration of the opinion of the agency's

employee.  The "opinion" at issue here is contained in a form completed on December

11, 2013 by the employee at issue, J. Hutcheson.  (R. 387-89).  This was a "Form SSA-

3367," "Disability Report – Field Office."  At issue is Section 9 of the form, entitled

"Observations/Perceptions."  Id. at 388.  That section contains a list of 14 functions an

individual performs including hearing, breathing, understanding, coherency,

concentration, talking, writing, etc., along with a catch-all category titled "Other

(specify)."  Id.  The directions for completing section 9 explain:  "If the claimant had

difficulty with the following, explain in Observations, or show 'No' or 'Not

observed/perceived.'"  Id.  The only function the employee marked "Yes" was

"Understanding."  Id.  Under "Observations," the employee entered:  "At times she

would pause and 'blank out' and then engage in the question."  Id.  The employee did not

indicate that Plaintiff did not understand certain questions, did not indicate that Plaintiff ignored the question, did not indicate that she asked that the questions be repeated or explained. Rather, the employee indicated that Plaintiff would pause and blank out "at times," but would then engage in the question. Again, there is no rational, concrete way to evaluate this "opinion." It is not an opinion relevant to disability and as the Commissioner argues it is not significantly probative or worthy of an attempted explanation. The court finds no error in the ALJ's failure to discuss in his decision either Dr. Faber's statement or the statement of the SSA employee.

## IV.    The Opinion Evidence

Plaintiff claims the ALJ erroneously evaluated the opinions of her spouse and of her friend and the medical opinions of her treating physicians, Dr. Willson and Dr. Cordova.

### A.      Third-Party Opinions

Plaintiff argues that the ALJ rejected the third-party opinions of her spouse and her friend because these individuals "are not medically trained and they lack 'medically acceptable standards,'" and that thereby he applied the incorrect legal standard because "[t]he purpose of third party statements is to go beyond what is contained in the medical records and shed additional light on how [Plaintiff] is affected by the symptoms as the symptoms experienced can demonstrate greater severity than the objective medical evidence alone." (Pl. Br. 23) (quoting R. 55).

The ALJ explained his evaluation of these third-party opinions:

> These other sources generally support the claimant's allegations. However, because these other sources have no medical training to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the information provided is questionable. However, the undersigned has considered these opinions in terms of helping to understand the severity of the claimant's various symptoms overtime [sic] as explained in SSR 06-03p (also see 20 CFR 404.1512 and 416.912). Even so, these reports from the claimant's spouse and friend do not establish that she is disabled, and cannot carry the claimant's burden of proof. Therefore, the undersigned gives little weight to these other sources assessing the claimant's current functional limitations because of their lack of medically acceptable standards.

(R. 55). While Plaintiff is correct that an adjudicator must use third-party opinions to shed additional light on the effect of the claimant's symptoms, that is precisely what the ALJ did here. Although Plaintiff is correct that the ALJ stated he discounted these individuals' statements "because of their lack of medically acceptable standards," he also specifically noted that he had considered the opinions to help "to understand the severity of the claimant's various symptoms" over time. Id. He considered the opinions and explained how he had evaluated them in accordance with the requisite standard. More is not required.

### B.    Medical Opinions

Plaintiff argues that the record evidence is contrary to the ALJ's reasons for discounting Dr. Willson's opinion and she "was unable to locate Dr. Willson's assessment of a GAF [(Global Assessment of Functioning)] score of 60-80." (Pl. Br. 24-25). She argues that Dr. Cordova's treatment notes were not as "normal" as the ALJ found, and that "[t]he ALJ has clearly and repeatedly improperly substituted his own 'medical expertise' for that of the treating physicians." Id. at 26 (erroneously citing

9

Kemp v. Bowen, 186 F.2d 1469, 1476 (10th Cur. 1987);[4] and footnoting Combs v.

Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Strongson v. Barnhart, 361 F.3d

1066, 1071 (8th Cir. 2004))).

1.    Standard for Evaluating Medical Opinions

For claims filed before March 17, 2017, "[m]edical opinions are statements from

physicians and psychologists or other acceptable medical sources[5] that reflect judgments

about the nature and severity of [a claimant's] impairment(s) including [claimant's]

symptoms, diagnosis and prognosis."  20 C.F.R. § 404.1527(a)(2).  Such opinions may

not be ignored and, unless a treating source opinion is given controlling weight, all

medical opinions will be evaluated by the Commissioner in accordance with factors

contained in the regulations.  Id. § 404.1527(c); SSR 96-5p, West's Soc. Sec. Reporting

Serv., Rulings 123-24 (Supp. 2019).  A physician who has treated a patient frequently

over an extended period (a treating source) is expected to have greater insight into the

patient's medical condition, and his opinion is generally entitled to "particular weight."

---

[4] The correct citation is: 816 F.2d 1469, 1476 (10th Cir. 1987).

[5] The regulations define three types of "acceptable medical sources:"

"Treating source:" an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. § 404.1502.

"Nontreating source:" an "acceptable medical source" who has examined the claimant but never had a treatment relationship.  Id.

"Nonexamining source:" an "acceptable medical source" who has not examined the claimant but provides a medical opinion.  Id.

Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)). However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2019) ("Giving Controlling Weight to Treating Source Medical Opinions").

If the treating source opinion is not given controlling weight, the inquiry does not end. Id. A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of

examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); 20 C.F.R. § 404.1527(c)(2-6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the factors, the ALJ must give reasons in the decision for the weight he gives the treating source opinion. Id. 350 F.3d at 1301. "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so." Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

2.      The ALJ's Findings

The ALJ discounted Dr. Willson's opinions and accorded them little weight because Dr. Willson's

> treatment records consistently noted [(1)] the claimant had a normal mood and affect, a logical and goal directed thought process, grossly intact cognition and that [(2)] the claimant was absent any suicidal or homicidal ideation (Exs. 10F/12, 11F, 29F, 32F). Additionally, Dr. Wilson[6] [(3)] consistently assessed GAF scores or [sic] 60 to 80.

(R. 52) (numbering added for ease of discussion).

---

[6] The ALJ addressed Dr. Willson as Dr. "Wilson," but the parties do not argue that the Psychiatrist referred to is not the same individual.

The ALJ also accorded little weight to Dr. Cordova's opinions, because she assessed no functional limitations other than the general limitation that Plaintiff "has poor to no ability to deal with the stress of typically low-stress jobs," because Dr. Cordova's opinion is not supported by her "treatment records that consistently noted the claimant was alert and oriented times three, and that she had a normal mood and affect," and because she recorded "that the claimant said that things were good at home and she was doing well overall." (R. 54) (citing Exs. 9F pp. 12, 13, 16. 24, 29; and 24F).

3.     Analysis

The record evidence supports the ALJ's reasons to discount the physicians' opinions. In attacking the ALJ's evaluation of Dr. Willson's opinions, Plaintiff focuses on the ALJ's citation to exhibit 10F, page 12, and argues, "Contrary to the ALJ's conclusion, that record shows fair grooming, pessimistic attitude, tearful affect, depressed, anxious mood, and limited concentration." (Pl. Br. 24-25) (citing R. 789). Plaintiff is correct in her assertion of what R. 789 reveals, but she ignores that the treatment note reveals no ideas of self harm or ideas of harm to others which supports reason 2 for discounting Dr. Willson's opinions. (R. 789). Moreover, she ignores the other record evidence cited by the ALJ which, as the ALJ found "consistently noted the claimant had a normal mood and affect, a logical and goal directed thought process, grossly intact cognition and that the claimant was absent any suicidal or homicidal ideation" which support both reason 1 and reason 2. (R. 52). What the ALJ's citation of exhibit 10F, p. 12 demonstrates is that the ALJ was fairly considering and citing the

record evidence and recognized that not all the treatment notes were identical, but that they were consistent in the overall impression given.

Plaintiff then asserts that she "was unable to locate Dr. Willson's assessment of a GAF score of 60-80." (Pl. Br. 25). Again, Plaintiff misapprehends the ALJ's finding. As quoted above, the ALJ found "Dr. Wilson consistently assessed GAF scores o[f] 60 to 80." (R. 52) (emphasis added). What the ALJ was emphasizing was that Dr. Willson's treatment notes consistently reflected current GAF scores in the range of 60 to 80 (moderate, mild, or transient symptoms), not than any individual GAF score was reported as "60 to 80."

Plaintiff has shown no error in the ALJ's reasons for discounting Dr. Willson's opinion. Her remaining arguments seek to show that the record would support affording Dr. Willson's opinions greater weight. However, Plaintiff must demonstrate the error in the ALJ's rationale or finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Plaintiff also disagrees with the ALJ's evaluation of Dr. Cordova's opinion. (Pl. Br. 25-26). Plaintiff seems to admit that that the reasons given to discount Dr. Cordova's

opinion are supported by the record.  But, she argues that Dr. Cordova found that Plaintiff "was also depressed on exam and tearful."  Id. at 26 (citations omitted).  She points out that "Dr. Cordova repeatedly diagnosed and treated depression, anxiety, cognitive disorder, and fatigue."  Id.  She argues, "The ALJ has clearly and repeatedly improperly substituted his own 'medical expertise' for that of the treating physicians."  (Pl. Br. 26) (citing Kemp, 816 F.2d at 1476; and footnoting Combs, 878 F.3d at 646 (quoting Strongson, 361 F.3d at 1071)).  In her Reply Brief, she argues that the ALJ's reliance on Dr. Cordova's recording of Plaintiff's statement that "she was doing well overall and things were good at home" is error because "this statement was made when [Plaintiff] was not working and no demands were being made on her."  (Reply 10).

Plaintiff's arguments fail for several reasons.  First, the mere presence and treatment of a symptom or the diagnosis and treatment of an impairment does not equate to disability.  The question is whether the symptoms or the impairment are so functionally limiting as to preclude all substantial gainful activity.  The ALJ and the AC both found that Plaintiff has the severe impairments of cerebrovascular accident, bipolar disorder, depression, and anxiety.  (R. 5, 50).  Therefore, Dr. Cordova's diagnosis and treatment of these impairments and related symptoms does not require that her opinion be given greater weight or that the ALJ may not discount her opinion for other reasons.

Plaintiff's argument that her report of doing well overall does not justify discounting Dr. Cordova's opinion because she was not working and no demands were made on her ignores that this report was during the time when Dr. Cordova was treating her.  Dr. Cordova's recording of Plaintiff's report in Dr. Cordova's last treatment note

15

does suggest that Dr. Cordova's opinion of disabling stress made more than a year later and after no further treatment by her is not supported by her actual treatment of Plaintiff.

Finally, the court finds that the ALJ did not substitute his own "medical expertise" for the treating physicians' expertise. As Plaintiff's citation suggests, the court in <u>Kemp</u> stated the principle: "While the ALJ is authorized to make a final decision concerning disability, he can not interpose his own 'medical expertise' over that of a physician, especially when that physician is the regular treating doctor for the disability applicant." <u>Kemp</u>, 816 F.2d at 1476. However, the court noted in <u>Kemp</u> "there was not even evidence from a consulting physician retained by the agency to contradict the medical diagnosis, findings, and conclusions of her treating physician." <u>Id.</u> In <u>Kemp</u> the ALJ provided no evidentiary basis to find contrary to the diagnosis and limitations opined by the treating physician. Here, he has done so, and he explained his rationale. The case of <u>Winfrey v. Chater</u>, 92 F.3d 1017 (10th Cir. 1996) is instructive in deciding whether an ALJ has substituted his "medical expertise" for that of a physician.

In <u>Winfrey</u>, the record contained medical opinions from three doctors regarding the plaintiff's mental impairments. 92 F.3d at 1021-22. The plaintiff was first examined in 1992 by Dr. Spray who performed a mental status exam and administered several tests including the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). <u>Id.</u> at 1021. Dr. Spray diagnosed the plaintiff with somatoform disorder, dysthymia, history of alcohol abuse, and personality disorder. <u>Id.</u> The next year Dr. Dean, a psychiatrist, performed a mental examination of the plaintiff for the agency and diagnosed generalized anxiety disorder and major depression. <u>Id.</u> When asked, Dr. Dean explained that he "'was

unable to adequately assess the presence or absence of objective findings which would either corroborate or eliminate the presence of a somatoform disorder,' because he was not given complete data on plaintiff's medical care and he neither obtained a complete medical history from plaintiff nor conducted his own physical examination of plaintiff." Winfrey, 92 F.3d at 1021. Later that year, Dr. Spray examined the plaintiff again. His diagnoses in 1993 were the same as in 1992 except he changed one diagnosis from "history of alcohol abuse" to "alcohol abuse." Id. at 1021-22.

At the hearing in Kemp a psychiatrist, Dr. Goodman, testified as a medical adviser for the agency based upon his review of the record. Id. at 1022. He thought there appeared physical reasons for the plaintiff's somatic complaints and questioned Dr. Spray's diagnosis of somatoform disorder. Id. The ALJ ultimately found that the plaintiff did not have somatoform disorder because of:

> (1) Dr. Goodman's opinion that there were physical reasons for plaintiff's somatic complaints; (2) his own interpretation of "Dr. Dean's initial failure to consider this diagnosis [as] a reflection of his belief at the time that such diagnosis was not warranted; and (3) his own opinion that Dr. Spray improperly used the MMPI–2 as a basis for the diagnosis.

Winfrey, 92 F.3d at 1022. The court rejected the first reason because as a nonexamining source Dr. Goodman's opinion was not deserving of as much weight as was Dr. Spray's and Dr. Spray's opinion was consistent with Dr. Dean's, the only other opinion in this regard. Id. The court rejected the second reason because Dr. Dean had explained the reason he did not diagnose somatoform disorder. Id. Finally, the court rejected the third reason because the ALJ overstepped his bounds and "substituted his medical judgment for that of Dr. Spray, by determining that the results of the MMPI–2 test were not an

adequate basis on which to make a diagnosis." Id. In Winfrey the ALJ provided three reasons to discount Dr. Spray's opinion and the court rejected all three of them. However, only one was rejected because the ALJ substituted his medical expertise for that of the doctor. The other two were rejected because they were not supported by the record evidence. The difference was that the third reason was the ALJ's disagreement with the doctor's diagnosis, and not merely the diagnosis but the doctor's medical judgment regarding the adequacy of the bases for the diagnosis. Here, however the ALJ accepted Dr. Willson's and Dr. Cordova's diagnoses. But he provided evidentiary bases to discount the doctors' opinions as to the severity of the limitations assessed and those bases are supported by the record evidence.

In a footnote to her Brief, Plaintiff cites Eighth Circuit case law for the proposition that an ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports." (Pl. Br. 26, n.1) (citing Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004)). The court notes that Eighth Circuit opinions are not precedent binding on this court. Without deciding whether Eighth Circuit law goes so far as Plaintiff's Brief implies, the court notes that Tenth Circuit law clearly does not. As explained above, Tenth Circuit law is clear that an ALJ may not substitute his medical expertise for that of a doctor. But the law is equally clear that "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing

Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)).  Because

RFC assessment is made based on "all of the evidence in the record, not only the medical

evidence, [it is] well within the province of the ALJ."  Dixon v. Apfel, No. 98-5167, 1999

WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 404.1545(a).  Moreover, the

final responsibility for determining RFC rests with the Commissioner.  20 C.F.R.

§§ 404.1527(e)(2), 404.1546.

## V.      Mental RFC Assessment

Plaintiff claims the Mental RFC assessed by the ALJ is unsupported by substantial

evidence because the ALJ did not account for his findings of moderate limitation in

maintaining concentration, persistence, or pace; and moderate limitation in

understanding, remembering, or applying information; and failed to account for

Plaintiff's learning deficits.  (Pl. Br. 26-27) (citing R. 51, 863, 864).  The Commissioner

asserts that Plaintiff's argument regarding moderate limitation in maintaining

concentration, persistence, or pace; and moderate limitation in understanding,

remembering, or applying information conflates the evaluation of the "B criteria" of the

Listing of Mental Disorders at steps two and three of the sequential evaluation process

with the assessment of RFC between steps three and four.  (Comm'r Br. 21-22).  In her

Reply Brief Plaintiff acknowledges the Commissioner's argument that the step two and

three consideration of the Paragraph B criteria is different than the RFC assessment, but

argues that the Commissioner ignored the requirement that an ALJ provide "a more

detailed assessment by itemizing various functions contained in" paragraphs B and C of

the mental disorder Listings.  (Reply 11) (quoting SSR 96-8p).

**A.**     **Evaluation of Mental Impairments and Mental RFC Assessment**

At step three the ALJ discussed the four broad mental functional areas used in the

Commissioner's Psychiatric Review Technique which are the paragraph B criteria in

evaluating each of the Listed mental disorders except Listing 12.05.  As relevant to this

issue, he explained his evaluation of the mental functional areas of understanding,

remembering, and applying information; and of concentrating, persisting, or maintaining

pace:

> In understanding, remembering, or applying information, the claimant had a
> moderate limitation.  The claimant was noted to have a full-scale IQ of 107,
> which is in the average range (Ex. 12F/5).  However, the claimant reported
> having extensive memory difficulties (Ex. 12F/4).  Even so, the testing
> performed at a neuropsychological examination indicated average to high
> average scores in verbal comprehension, perceptual reasoning, working
> memory and processing speed (Ex. 12F/6).
>
> …
>
> With regard to concentrating, persisting, or maintaining pace, the claimant
> had a moderate limitation.  A treatment record from August 2014 noted that
> the claimant had concentration problems ([Ex. 26F/44]).  The claimant also
> testified that when she went to work for a women's clothing store, it took a
> lot of concentration to ring up the register or hold a conversation (See
> hearing testimony).

(R. 51).  He further explained:

> The limitations identified in the "paragraph B" criteria are not a residual
> functional capacity assessment but are used to rate the severity of mental
> impairments at steps 2 and 3 of the sequential evaluation process.  The
> mental residual functional capacity assessment used at steps 4 and 5 of the
> sequential evaluation process requires a more detailed assessment.  The
> following residual functional capacity assessment reflects the degree of
> limitation the undersigned has found in the "paragraph B" mental
> functional analysis.

Id. at 52. He then found that mentally Plaintiff "is limited to simple, routine and repetitive tasks." Id. (finding no. 6) (bold omitted).

The ALJ found Plaintiff's allegations "not fully consistent with the evidence of record." Id. at 53, see also 54. And he assessed her mental limitations:

> The claimant had a great deal of difficulty for a while and she is still in treatment. However, it appears that her condition stabilized. She was articulate at the hearing and could relate her history in detail. She is currently working parttime [sic] dealing with the public and she appears to be able to do what she wants to do (See hearing testimony). She visits with friends, attends a book club and plays Bunco (a group dice game) with others, attends her children's activities, shops, goes out to eat every night and pays her bills (Exs. 6E/7, 6E/12 and first hearing testimony). These activities indicate that she is at least capable of performing simple, routine and repetitive tasks. Therefore, the longitudinal medical evidence suggests that the residual functional capacity adequately accounts for the claimant's limitations due to her impairments.

(R. 53-54).

## B.    Analysis

The court finds the case of Vigil v. Colvin, 805 F.3d 1199 (10th Cir. 2015), cited by the Commissioner, controlling in this case. In that case, the court recognized that at step three the ALJ found that the plaintiff had moderate difficulties in concentration, persistence, and pace. 805 F.3d at 1203. The court recognized that the step two and three findings regarding the paragraph B criteria are not an RFC assessment and the ALJ's findings "at step three do[] not necessarily translate to [] work-related functional limitation[s] for the purposes of the RFC assessment." Id. (citing SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996)). The court went on to consider the ALJ's "'more detailed' step four assessment of [the plaintiff's] RFC," id., and determined that the ALJ accounted

for the plaintiff's moderate limitations in the paragraph B criteria "by limiting him to unskilled work." Id. at 1204. The court acknowledged that in some cases a limitation to unskilled work may not account for all of a claimant's mental limitations, but that the ALJ's explanation adequately accounted for the claimant's mental limitations. Id. (noting "Unskilled work generally requires only the following: (1) '[u]nderstanding, remembering, and carrying out simple instructions'; (2) '[m]aking judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions'; (3) '[r]esponding appropriately to supervision, co-workers and usual work situations'; and (4) '[d]ealing with changes in a routine work setting.'" (quoting SSR 96-8p).

Thus, the question isn't whether the limitations the ALJ assessed in the broad mental functional areas at steps two and three are included within the RFC assessed, but whether the ALJ explained his mental RFC assessment and whether that explanation is supported by the record evidence. As quoted above, the ALJ here explained his rationale in determining Plaintiff is at least capable of performing simple, routine, and repetitive tasks, that rationale is supported by the record evidence, and Plaintiff has not met her burden to show otherwise. Plaintiff's arguments based on unpublished opinions of the Tenth Circuit and non-binding opinions of other circuit or district courts are not persuasive and cannot contravene the binding precedent of Vigil.

Plaintiff's argument that the ALJ's RFC for simple, routine, repetitive tasks does not account for Plaintiff's learning deficits is similarly unavailing. Plaintiff's argument is based on the report of a "Neuropsychological Evaluation" performed by psychologist, William Blessing, on December 29, 2013. (R. 254-64). Plaintiff cites Dr. Blessing's

finding of deficits in phonological fluency which appear unlikely to spontaneously improve. (Pl. Br. 27-28). In her Reply Brief, Plaintiff argues that the Commissioner failed to directly address this issue in his Brief and the ALJ did not account for these deficits in learning. (Reply 13).

Plaintiff's argument ignores the ALJ's discussion of Dr. Blessing's neuropsychological examination when evaluating the broad mental functional area of understanding, remembering, or applying information as quoted above. (R. 51) (citing Ex. 12F). Moreover, Plaintiff ignores the second "Principle Finding" of Dr. Blessing's report: "Learning was relatively inefficient but within normal limits. Memory function was fundamentally intact for both verbal and visual information. The learning inefficiency appears to underlie the memory difficulties reported." (R. 863) (emphases added). Dr. Blessing's findings agree with and support the ALJ's explanation that Plaintiff's condition has stabilized and "that she is at least capable of performing simple, routine and repetitive tasks." (R. 53).

## VI.    The Appeals Council's Step Five Finding

Plaintiff argues that the AC erroneously purported to rely on section 204.00 of the Medical-Vocational Guidelines (the grids) for its finding that Plaintiff is not disabled because an RFC for simple, routine, repetitive tasks does not significantly erode the occupational base of unskilled work at any exertional level. She argues that section does not address a limitation to simple, routine, repetitive tasks. She argues it is erroneous to rely on the grid rules for individuals with solely non-exertional impairments such as she

has (Pl Br. 29) (citing SSR 85-15), and that it is necessary in such a situation to rely on a VE. <u>Id.</u> at 30.

The Commissioner argues that SSR 85-15 explains how to use the grids as a framework for decision in a situation such as this involving solely non-exertional impairments, and SSR 83-14 explains how a particular non-exertional "limitation may have very little effect on the range of work remaining that an individual can perform." (Comm'r Br. 23) (quoting 1983 WL 31254, at *3). He argues that the AC recognized this and "used the Grid rules in section 204.00, 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00, as a framework and determined that Plaintiff's RFC for simple, routine, and repetitive tasks did not significantly erode the occupation[al] base of unskilled work at any exertional level." <u>Id.</u> at 24 (citing R. 5, and 20 C.F.R. § 404.1569a(d)). The Commissioner argues that the use of the grids as a framework for deciding cases involving non-exertional limitations is "consistent with agency regulations and rulings, as well as decisions from the Tenth Circuit Court of Appeals." <u>Id.</u> He argues that the Tenth Circuit rejected Plaintiff's argument in <u>Conkle v. Astrue</u>, 487 F. App'x 461, 462 (10th Cir. 2012), this court rejected the argument in <u>Love v. Colvin</u>, Civ. A. No. 14-1078-JWL, 2015 WL 1530599, at *10 (D. Kan. Apr. 6, 2015), and the court should likewise reject the argument here.

## B. Standard for Using the Grids

In the grids, the Commissioner has provided a tool to aid in making uniform, efficient decisions in determining the types and numbers of jobs existing in the national economy for certain classes of claimants. <u>Heckler v. Campbell</u>, 461 U.S. 458, 468

(1983). However, the grids are applicable "only when they describe a claimant's abilities and limitations accurately." Id. 461 U.S. at 462 n.5; see also Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984). Because the grids are based upon the physical exertion requirements for work in the national economy, they may not be fully applicable for claimants who have nonexertional limitations. Channel, 747 F.2d at 580. Realizing this limitation on the use of the grids, the Commissioner has promulgated a procedure for evaluating claims where both exertional and nonexertional impairments are present:

> (2) [W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.

20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2); see also Channel, 747 F.2d at 580-81.

The grids direct a finding in a particular case only when there is an "exact fit" between the criteria of the grid and the situation before the ALJ. Campbell, 461 U.S. at 468; Channel, 747 F.2d at 579. Where the grid rules do not direct a finding, "full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations which will provide insight into the adjudicative weight to be accorded each factor." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(e)(2); see also Channel, 747 F.2d at 579-82 (application of the grids where nonexertional limitations are present).

Where a claimant is unable to do a full range of work in an exertional category, the ALJ may not conclusively apply the grids.  Channel, 747 F.2d at 582 (error to apply the grids absent a finding that plaintiff could perform the full range of sedentary work).  Instead, he "must give 'full consideration' to 'all the relevant facts,' App. 2, § 200.00(e)(2), including expert vocational testimony if necessary, in determining whether [plaintiff] is or is not disabled."  Channel, 747 F.2d at 583.  Where nonexertional limitations affect the range of work of which a claimant is capable, the grids may serve only as a framework to assist in determining whether sufficient jobs exist in the national economy given the claimant's limitations and characteristics.  Gossett v. Bowen, 862 F.2d 802, 806 (10th Cir. 1988).

But, "[T]he mere presence of a nonexertional impairment does not automatically preclude reliance on the grids.  Use of the grids is foreclosed only '[t]o the extent that nonexertional impairments further limit the range of jobs available to the [plaintiff].'" Channel, 747 F.2d at 583, n.6 (quoting Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983)).  Thus, use of a vocational expert is required only where a claimant's nonexertional impairments cause a limitation on the range of work available in a particular occupational base and where no other evidence (either in the record or in occupational resources upon which the Commissioner may rely, see 20 C.F.R. § 404.1566(d)) establishes that a significant number of jobs of which plaintiff is capable are available.  Where the grids establish that a significant number of jobs exist in the economy, the Commissioner need not introduce evidence of specific available jobs. Campbell, 461 U.S. at 468-70.

## C.    The Appeals Council Finding

The AC discussed its step five finding:

> At step 5 of the sequential evaluation, the Appeals Council finds that the claimant's residual functional capacity for simple, routine, repetitive tasks does not significantly erode the occupational base of unskilled work at any exertional level.

(R. 5).  It also stated its step five finding:

> The claimant's residual functional capacity for simple, routine, and repetitive tasks does not significantly erode the occupational base of unskilled work at any exertional level.  A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

Id.

## D.    Analysis

As noted above, the mere presence of the nonexertional mental impairments does not preclude the AC's reliance on the grids.  But, reliance on grid section 204.00 to direct a decision is foreclosed if the impairments cause a limitation beyond the full range of the heavy unskilled occupational base and no other evidence establishes that a significant number of jobs of which plaintiff is capable remain available.  As the ALJ stated in his decision, "If the claimant has solely nonexertional limitations [(which is the case here)], section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking."  (R. 56).  And, as the Commissioner argues here, the ALJ used section 204.00 only as a framework for its decisionmaking.  The real question for the court then, is whether there is an evidentiary or other basis for the AC's finding that Plaintiff's RFC

"for simple, routine, and repetitive tasks does not significantly erode the occupational base of unskilled work at any exertional level." (R. 5). The court finds there is.

The court finds the Commissioner's appeal to Conkle and Love lead ineluctably to this conclusion. In Conkle, the court found the plaintiff's RFC limitations to light work with "simple instructions and no more than incidental work with the public … do not significantly erode the occupational base for light work because the basic mental demands for such unskilled work comport with the limiting effects of her impairments." Conkle, 487 F. Apex at 462 (quoting SSR 85-15) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."). Here, both the AC and the ALJ found Plaintiff could perform work at all exertional levels limited only to simple, routine, repetitive tasks. (R. 5, 52). Plaintiff has shown no limitation beyond the basic mental demands of competitive, remunerative, unskilled work as explained in Conkle.

The Commissioner's most appealing argument is his citation to this court's decision in Love. In Love the court recognized that the ALJ had given the plaintiff the benefit of the doubt regarding her physical impairment of obesity and found she was limited to sedentary work as a result thereof. 2015 WL 1530599 at *9. The ALJ found the plaintiff had additional mental limitations to simple, repetitive work which require only one or two step instructions, and does not require interaction with the general public, and determined that "the additional limitations have little or no effect on the occupational

base of unskilled work." Id. (quoting the ALJ decision). The focus of the court's decision was the plaintiff's objection that no interaction with the general public would significantly reduce the occupational base for sedentary work was not supported by the fact that unskilled jobs generally deal primarily with objects rather than data or people. Id. 2015 WL 1530599 at *10.

In Love the court noted, "This is a close case," and stated, "This case likely represents the limits to which an ALJ might properly go in applying the grids rather than seeking the opinion of a vocational expert in a case where the claimant has both exertional and nonexertional limitations." Love, 2015 WL 1530599, at *11. Here, there are only nonexertional limitations, and only to simple, routine, repetitive tasks. While the occupational base in Love was limited to sedentary, unskilled work, here the occupational base at issue is unskilled work at all exertional levels.

Grid section 204.00 explains that "an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 204.00. The mental impairments at issue here fit comfortably within this explanation. Even without considering the range of unskilled heavy or very heavy work, the grids note. "The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do

not require skills or previous experience, and which can be performed after a short demonstration or within 30 days." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 203.00(a). Here, the occupational bases of unskilled work are exceedingly broad, Plaintiff is limited only to simple, routine, and repetitive tasks, and Plaintiff has not shown that her nonexertional impairments further limit the range of jobs available. If the circumstances in <u>Conkle</u>, and <u>Love</u> do not require the services of a vocational specialist, those present here do not either.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated November 7, 2019, at Kansas City, Kansas.


<u>s:/  John W. Lungstrum</u>
**John W. Lungstrum**
**United States District Judge**